# JAMES E. NEUMAN
**Attorney at Law**
100 Lafayette Street – Suite 501
New York, New York 10013

TEL 212-966-5612
FAX 646-651-4559
www.jamesneuman.com
james@jamesneuman.com



May 6, 2013

The Clerk of Court is Directed to:
Term motion (doc. #_____ )
☑ Doc. and File As: _____

BY E-MAIL
Hon. J. Paul Oetkin
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Re: *United States v Zemylansky, et al.* 12 Cr 171 (JPO): Expert disclosure

Your Honor:

      I represent Mikhail Ostrumsky in the referenced matter. I am submitting this letter, on behalf of the defendants who are scheduled for trial in June[1], to alert the Court to issues arising out of the government's expert disclosure letter and request prompt corrective actions, which are suggested at the close of this submission. Annexed hereto is a copy of the government's letter which was received at the end of the business day on May 3, 2013, and relevant portions of the transcript of the conference on April 19, 2013. To be blunt, the government's disclosure letter is deficient in numerous respects, raises more questions than it answers and gives rise to the real possibility that the defense will be unable to prepare for trial on the current schedule. Indeed, I am submitting this letter now – one business day after receiving the government's submission – to provide this Court with as many options as possible for remedying the problems discussed herein, including further disclosure orders and/or adjournment of the trial.

## The April 19, 2013 conference

      By way of background, when the subject of expert testimony was last discussed in court on April 19th, AUSA Daniel Goldman stated that the government would provide a "detailed expert report" on May 3, 2013. In response, I remarked that May 3rd "might work," depending upon

---

[1]    Except for Ronald Fischetti, who represents Michael Zemylansky, all of the attorneys in the June group expressly told me they joined in this letter. I was unable to elicit a response from Mr. Fischetti before making this submission.

Hon. J. Paul Oetkin
May 6, 2013
Page 2

the volume of material. T73. When I inquired whether the report would identify the materials relied upon by the experts, AUSA Goldman replied, "That's our goal. That is our goal. We can't promise that every single item that an expert will review will be done by then, but that is certainly our goal, and we would like to give ample notice because we know it does take time for defense experts to review things, Judge." T73-74.   AUSA Goldman also indicated that on May 3rd the government would identify the universe of recordings expected to be introduced at trial. T68.

As the colloquy continued, I asked AUSA Goldman to clarify whether one of the experts would be a "statistical expert," and if so, whether the government would identify the universe of records being sampled in addition to the records that constituted the sample. T75. He responded that there would be both a "medical doctor expert" and "expert testimony relating to statistical analysis of patient records and that they would identify the records that the experts are reviewing, both in terms of the larger universe of them as well as the sampling." T75. He added that there might be an expert on no-fault law and an expert on doctors' continuing education obligations. T75.

In view of those representations, I stated that I was "very concerned about having enough time" to locate experts and provide them sufficient time to perform their own analyses. I also noted the possible need to brief the admissibility of the expert testimony, particularly the statistical analysis. Without seeing the reports yet, I declined to take the position that the contemplated schedule would leave inadequate time, but remarked "from my point of view, I can easily see us in a situation where we're hit with some of these expert reports and the opinions and we're going to be asking for more time just to prepare for the trial ****" T76. But AUSA Goldman assured the court:

> "It's more than six weeks your Honor. It's a lot of time, and we are going to provide the direction to already be setting the state for an adjournment two months in advance of trial, when you will understand what the expert testimony will likely be, and you will get much more detailed notice and the information upon which it is based, more than six weeks before trial. Seems to be very premature" T76-77.

The May 3rd disclosure

Unfortunately, the notice provided in the government's letter dated May 3rd was far less informative than promised. Initially, AUSA Goldman advised the defense in an accompanying email that a "few more days" would be needed to identify the universe of wire intercepted conversations that they may use at trial. He also indicated that the materials relied upon by the medical expert were not included presently, but would be provided "early next week" (though some

Hon. J. Paul Oetkin
May 6, 2013
**Page 3**

were not yet available and might be provided later).  No explanation was offered for the delay in providing such materials. While a truly slight delay may prove inconsequential, a larger delay may well impact the ability of defense experts to perform their own analysis.

More significant are the problems with the substance of the notice itself.  The government's letter identifies three potential experts: Dr. Randall L. Braddom, a doctor of physical medicine and rehabilitation who will provide an analysis of "claim files" and "billing records"; Lawrence Fuchsberg, Esq., a reported expert on No-Fault law who will testify about the various requirements the law imposes on doctors and insurance companies; and an unnamed member from the Department of Education, who might testify about continuing education obligations of physicians.

Regarding Dr. Braddom, the letter broadly describes the types of fraud that has reportedly found, such as: (1) billing at unnecessarily high rates; (2) billing for services not provided; and (3) billing for services that were below the "standard of care."  *See,* 5/3/13 letter, p.2.  Such generalities, though, basically mimic the allegations of the indictment.  Later, the letter adds somewhat more detail, indicating that the clinics frequently billed insurance companies for codes associated with the two most expensive types of visits; range of motion tests and manual muscle testing were not administered correctly; outcome assessment testing was billed, but not necessary or not rendered; and billing for "brain mapping" was also "inappropriate."  5/3/13 letter, pp.2-4.

Yet, these specifics still fall well short of the "detailed expert report" promised by the government at the April 19th conference.  In fact, the defendants could not ask their own experts to review the findings of Dr. Braddom because there are no detailed findings to review.  *See, United States v White,* 492 F.3d 380, 406 (6th Cir. 2007) (the notice must "provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination").  Indeed, the government implicitly recognizes that a more detailed report is necessary.  For the letter also indicates that the government will provide a written report by Dr. Braddom "that sets forth his research and conclusions in greater detail as soon as it is available, and no later than June 7, 2013."  5/3/13 letter, p.4.[2]  Notably, the government's obligation here is not vitiated just because Dr. Braddom may not have completed his report yet. *See, United States v White,* 492 F.3d at 406, *supra*

---

[2]

The government's letter also fails to provide detail about the anticipated testimony of Mr. Fuchsberg. The letter lists categories of requirements Mr. Fuchsberg will testify about, but does not actually include any of his conclusions. 5/3/13 letter, pp.4-5. Insofar as Mr. Fuchsberg's anticipated testimony concerns legal requirements, rather than masses of documentation, we are frankly less concerned about the timing of a detailed report, though we do believe that one is required for his testimony as well. It is unclear, for example, whether Mr. Fuchsberg will offer opinions on the crucial issues of "ownership" and "control." If so, that should certainly be disclosed in detail well advance of trial.

Hon. J. Paul Oetkin
May 6, 2013
Page 4

(the summary of the bases of the expert's opinion must be provided even where the proffered experts prepared no reports).

Moreover, waiting weeks, potentially until June 7th, to provide the defense with a genuine expert report, places the defense in a completely untenable position. Not only does that timing preclude comprehensive review by independent experts, it conflicts with the recently-agreed upon schedule for filing *in limine* motions. According to that schedule, the defense will file *in limine* by May 28th. Without a detailed expert report that actually *sets forth* Dr. Braddom's specific factual findings, reasoning and conclusions, the defense will be unable to explore and brief viable arguments pertaining to his testimony. The late disclosure of Dr. Braddom's report is particularly inexplicable since defense counsel stated at the conference that the expert testimony may well be the subject of pretrial litigation. Considering the centrality of the expert testimony, it is essential that defense counsel have sufficient time to prepare *in limine* motions, not to mention that this Court have sufficient time to render a decision prior to opening statements.[3]

This timing also makes it extremely difficult for assigned counsel even to retain experts. The process for obtaining court authorization to retain experts is multi-tiered. First, counsel must determine whether it is prudent to consult with independent experts. Next, counsel must locate experts who are both available and willing to perform the work, in the allotted time. Naturally, responsible experts will not agree to undertake the work without clearly understanding the amount of work entailed. Once a willing expert is found, then counsel must apply to the Court and demonstrate that the work is necessary *and* that the cost is reasonable. At times, the Court, on advice of the CJA office, will demand that counsel renegotiate fees or look to other experts. Where, as here, the subject matter of the proffered expert testimony is novel or complex, assigned counsel may well be unable to take all of these steps without first having a thorough report from the government's expert (as well as the materials relied upon by the expert).

Another deficiency with the government's letter is that it does not even name each expert. As noted, the letter states that the government may also call an unnamed expert witness from the Department of Education to testify about, *inter alia*, continuing education requirements for doctors. 5/3/13 letter, p5. The letter does not indicate when the government would decide whether to call a witness from the Department of Education, let alone attempt to justify why that decision had not already been made. Without this information, the defense cannot even ascertain whether it is necessary to retain their own experts dealing with continuing education issues.

---

[3]   It is also not entirely clear to the defense what the materials encompass. The government's letter says that Dr. Braddom will testify about "claim files" during limited periods and "medical billing records" during the entire period that the clinics operated. Those categories, however, are not described further. Without a complete description of the records, counsel cannot advise potential defense expert witnesses about how much work is required of them.

Hon. J. Paul Oetkin
May 6, 2013
Page 5

   Perhaps most troubling, <u>the letter suggests that the government is implicitly relying upon an expert witness whose identity and analysis are not explicitly disclosed at all</u>. The letter explains that Dr. Braddom will discuss his review of "claim files" maintained by four insurance companies, during different two-month periods (without explaining why those particular periods were chosen) and his review of "medical billing records" for each clinic during the entire period of their operation. Later, the letter states that Dr. Braddom will "testify about a statistical analysis of the type and number of treatments and diagnostic tests prescribed and/or performed by physicians working at the No-Fault clinics." The analysis supposedly will show that "an overwhelming percentage of patients were prescribed a substantially similar, if not identical, array of treatments and diagnostic tests" and will also show that such treatments and tests "were prescribed in order to inflate billings," rather than for medical necessity.

   Yet, Dr. Braddom's resume indicates that he is not a statistician. In fact, a review of the recently-received transcript of the case often cited by the parties in other contexts - *United States v Chervin* 10 Cr. 918 (RPP) – reveals that Dr. Braddom testified there and relied upon information supplied by a statistician who apparently was not called as a witness. In that case, Dr. Braddom related that the statistician had provided him with 15% of the bills by the clinic in question, upon determining that a 15% sampling was "adequate." Dr. Braddom acknowledged that he did not how the statistician had chosen the particular bills that were provided to him.

   Based upon the government's letter - as well as prior representations at the April 19th conference - it appears that, at this trial, Dr. Braddom will similarly rely upon a sampling chosen by some unnamed statistician, on the representation that the sample was selected properly and may somehow be considered representative. In fact, if Dr. Braddom's testimony follows a similar tract as to what occurred in the *Chervin* case, he will offer a statistical comparison of the frequency of certain treatments and billing at the defendants' clinics with the frequency of those treatments and billing at other clinics, not named in the indictment.

   Setting aside whether Dr. Braddom's contemplated testimony violates the hearsay rules or is inadmissible on any other ground – which will likely be litigated later – <u>we submit that the government is legally obligated to disclose the identity of any statistician relied upon by Dr. Braddom, as well as the statistician's report and materials relied upon by the statistician, just as is required for any other expert</u>. Indeed, considering how central Dr. Braddom's proffered statistical analysis is to the government's case, adequate pre-trial notice of the statistician's analysis is particularly crucial. Moreover, the materials relied upon by the statistician are likely to be voluminous, especially if they involve records from clinics not named in the indictment.

   To summarize, the government's notice suffers from the following deficiencies: (1) it postpones delivery of the materials relied upon by the government experts for at least several days;

Hon. J. Paul Oetkin
May 6. 2013
<u>Page 6</u>

(2) it lacks enough detail to be subjected to any kind of analysis by defense experts; (3) it promises a "detailed expert report" by Dr. Braddom weeks from now, perhaps as late as June 7th, potentially too late for analysis by defense experts and conflicting with the agreed-upon schedule for *in limine* motions; (4) it completely omits any information about the statistical expert and his reasoning; and (5) it fails to identify the name of a potential witness from the Department of Education. *Compare, United States v Duvall,* 272 F.3d 825, 828 (7th Cir. 2001) (notice inadequate); *United States v Wicker,* 848 F.2d 1059 (10th Cir. 1988); *United States v Naegele,* 468 F.Supp.2d 175, 176-77 (D.D.C. 2007); *United States v Birdsbill,* 243 F. Supp.2d 1128 (D. Mont. 2003);

<u>Requests for court intervention</u>

Considered together, the aforementioned deficiencies cause genuine concern whether the defendants have sufficient time to prepare for trial on the current schedule. Much of the contemplated expert testimony is not routine, and locating experts who are both qualified and available (particularly at court-approved rates) is not a simple matter. The analyses appear to be quite time-consuming (so much that Dr. Braddom's report is still not ready). Without ample time, the defendants may effectively be denied the opportunity to submit *in limine* motions, consult with their own experts, cross-examine the government experts and present expert testimony. As a consequence, the defendants will effectively be deprived of their Due Process and Sixth Amendment rights. *See generally, United States v Tin Yat Chin,* 476 F.3d 144, 146 (2nd Cir. 2007 (failure to provide adequate expert testimony notice may amount to an "ambush," constituting a deprivation of Due Process).

This Court has broad discretion to cure deficient expert notice, including granting a continuance and barring the proffered testimony. *See generally, United States v Shepard,* 462 F.3d 847, 866 (8th Cir. 2006), citing Fed. R. Crim. P. 16(d)(2); *see also, United States v Golyansky,* 291 F.3d 1285, 1249 (10th Cir. 1999) (noting factors to consider when fashioning an appropriate remedy). As an initial step, we request that the Court take the following actions:

-First, this Court should direct the government to identify *immediately*, by name, *every* expert witness who might be called at the trial, along with a detailed summary of that expert's anticipated testimony;

-Second, this Court should re-affirm that the government must provide all materials relied upon by all experts *immediately* (including an identification of all intercepted conversations to be introduced), as previously directed.

Hon. J. Paul Oetkin
May 6, 2013
<u>Page 7</u>

-Third, this Court should require the government to provide the detailed report by Dr. Braddom *immediately*, or at least, well in advance of the deadline for filing *in limine* motions (rather than June 7th, as suggested by the government).

-Fourth, this Court should specify that the government must *immediately* disclose the identity and detailed report of any statistician whose work is being relied upon by any other expert, regardless of whether the government intends to call the statistician as a witness (and directing that such information should include foundational materials about clinics not named in the indictment).

We emphasize that, even if the aforementioned relief is granted, we cannot be sure that there will be sufficient time for the defense to prepare for trial on the current schedule. A postponement of the trial may eventually be necessary in order for the defense to prepare *in limine* motions, retain experts and allow their experts sufficient time to do the necessary work. Indeed, the simplest remedy may well be to grant an adjournment now. Simply put, we believe that the relief specified here is a necessary, though not necessarily sufficient, condition to ensure a fair trial.

Respectfully submitted,


_____/s/_____
James E. Neuman


cc:    All counsel (by email)

-7-



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

_____

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 3, 2013

**BY ELECTRONIC MAIL**

Defense Counsel

> Re:   **United States v. Michael Zemlyansky et al.,**
>        **S1 12 Cr. 171 (JPO)**

Dear Counsel:

We are writing pursuant to an order of the Court and Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure to provide disclosure of expert witnesses the Government intends to call at trial scheduled to begin on June 17, 2013.

The Government intends to call the following expert witnesses: (1) Dr. Randall L. Braddom of the Penn Diagnostic Center, a renowned doctor of physical medicine & rehabilitation; (2) Lawrence Fuchsberg, Esq., No-Fault Counsel at the Office of General Counsel at the New York Department of Financial Services and an expert on New York's No-Fault Law; and (3) possibly an expert witness from the Department of Education. Below are summaries of the testimony that the Government expects each of these experts to provide at trial. In addition, we have enclosed copies of the curriculum vitae of Dr. Braddom and Mr. Fuchsberg, and will provide any curriculum vitae for any expert from the Department of Education as soon as practicable.

**Dr. Randall Braddom**

Dr. Braddom is expected to provide testimony concerning his analysis of claim files maintained by Allstate, GEICO, Liberty Mutual, and MetLife for patients who were treated by physicians working for the following four no-fault clinics during the following time periods: (1) Joseph Vitoulis DO PC from August 2010 to November 2010; (2) NTT Medical PC from September 2011 to November 2011; (3) DST Medical PC from October 2010 to December 2010; and Community Medical Care Associate PC from July 2011 to January 2012 (collectively, the "No-Fault Clinics"). In addition, Dr. Braddom is also expected to testify about his analysis of

Defense Counsel
May 3, 2013
Page 2

medical billing records for the No-Fault Clinics during the entire time period during which they were in operation.

The Government expects Dr. Braddom to testify that, based on his review of the above-referenced patient claim files and medical billing records, there was pervasive medical billing fraud at all four No-Fault Clinics. The fraudulent conduct included, among other things, (1) "up-coding" of certain current procedural terminology ("CPT") codes, which is a practice whereby the billed CPT code is of higher value and reimbursement-level than that appropriate for the actual service rendered; (2) "phantom billing," which is billing for services or treatments that were not actually performed; and (3) billing for services or treatments that were performed below the standard of care.

Specifically, Dr. Braddom's testimony will focus on his analysis of the following aspects of the patient claim files and medical billing records for the four No-Fault Clinics:

- Statistical analysis of treatments prescribed in connection with initial and follow-up examinations. Based on his review of initial examination and follow-up examination reports and billing data, Dr. Braddom will testify about a statistical analysis of the type and number of treatments and diagnostic tests prescribed and/or performed in connection with such examinations by physicians working at the No-Fault Clinics. This analysis is expected to show that during the relevant time periods, an overwhelming percentage of patients were prescribed a substantially similar, if not identical, array of treatments and diagnostic tests following the examinations. This statistical analysis indicates that such treatments and diagnostic tests were prescribed in order to inflate billings submitted to the insurance companies, not because they were medically necessary. Furthermore, Dr. Braddom is expected to testify that the provision of repeated treatments of physical therapy, acupuncture, and chiropractory on the same day does not meet the standard of care and is not medically necessary or sound.

- Up-coding of initial and follow-up examinations. Based on his review of initial examination and follow-up examination reports, as well as billing data provided by the insurance companies, Dr. Braddom is expected to testify about pervasive up-coding of the CPT code used to bill for both initial examinations and follow-up examinations of patients seen at the No-Fault Clinics. Indeed, the No-Fault Clinics frequently billed the insurance companies for CPT codes associated with the two most complex and time-consuming – and, therefore, most expensive – types of office visits. Dr. Braddom will testify that the pervasive use of such CPT

Defense Counsel
May 3, 2013
Page 3

codes was generally inappropriate in that far more accident victims received such complex treatments, and further unsupported by the patients' medical records as reflected in their initial evaluations.

- Range of Motion ("ROM") testing and Manual Muscle Testing ("MMT"). Based on his review of patient claim files, Dr. Braddom is expected to testify that the performance of ROM testing and MMT by the physicians administering and monitoring such studies at the No-Fault Clinics was below the standard of care. Specifically, Dr. Braddom will testify that the studies were not administered correctly and were incomplete, thereby resulting in meaningless or inaccurate results. For example, the results of certain ROM and MMT studies that Dr. Braddom reviewed indicated that the patients would not have had sufficient muscle strength to keep their head aloft, stand upright, or even stand at all, which was inconsistent with other information in the patients' charts. Accordingly, such studies could not have supported the medical conclusions drawn therefrom, nor could they have justified further testing and treatment that was recommended or performed. Dr. Braddom also is expected to testify about the frequency at which the No-Fault Clinics billed for such ROM testing and MMT based on medical billing records.

- Outcome Assessment Testing. Based on his review of patient claim files, Dr. Braddom will testify that the practice of the No-Fault Clinics of billing for Prolonged Physician Service (CPT codes 99358 and 99359) in connection with so-called "Outcome Assessment Testing" was inappropriate. Dr. Braddom will testify that the use of such CPT codes represented billing by the No-Fault Clinics for services that were not rendered and/or were not medically necessary. Dr. Braddom will also testify about the frequency at which the No-Fault Clinics billed in this manner for Outcome Assessment Testing based on medical billing records.

- Functional Cortical and Subcortical Mapping. Based on his review of patient claim files and medical billing data, Dr. Braddom will testify that the practice of the No-Fault Clinics of billing for functional cortical and subcortical mapping by stimulation and/or recording of electrodes on brain surface or depth electrodes (CPT codes 95961 and 95962) was inappropriate. Such CPT codes are billed in connection with direct electrical stimulation of the brain (commonly known as "brain mapping"), an invasive procedure performed during a craniotomy that involves the temporary removal of a bone flap from the skull to access the brain.

Defense Counsel
May 3, 2013
Page 4

Dr. Braddom will testify that the use of such CPT codes represented billing by the No-Fault Clinics for services that were not rendered and/or were not medically necessary.

The Government will provide you with the specific materials on which Dr. Braddom's expert testimony will be based early next week. In addition, the Government will provide you a written report prepared by Dr. Braddom that sets forth his research and conclusions in greater detail as soon as it is available, and no later than June 7, 2013.

**Lawrence Fuchsberg, Esq.**

As No-Fault Counsel in the Office of the General Counsel of the Department of Financial Services, Mr. Fuchsberg is an expert on New York's No-Fault Law. Mr. Fuchsberg has written numerous opinions for the Superintendent of Insurance, some of which have been adopted by New York Courts. Mr. Fuchsberg is expected to testify about basic New York No-Fault Law, including:

- the requirements of insurance companies to provide no-fault insurance and for New York car owners to maintain an insurance policy that includes no-fault insurance;

- the reimbursement up to $50,000 for medical treatments arising out of automobile accidents;

- the incorporation and licensing requirements for medical clinics, including fraudulent incorporation of no-fault clinics;

- the assignment of rights by patients to medical clinics, as well as the prohibition on doctors assigning their rights to collection companies or third-parties;

- Billing for no-fault treatments, including fee schedules, standard no-fault forms, including the NF-3 Form, time periods for service, and bills and payments/denials;

- Insurance companies requirements to investigate fraud, including the use of independent medical examinations, examinations under oath, and peer reviews;

Defense Counsel
May 3, 2013
Page 5

- Mechanisms to dispute denials of no-fault claims, including arbitration and litigation; and

- Personal injury lawsuits, including the threshold requirement of "serious bodily injury," particularly the 90-180 requirement.

<u>Department of Education</u>

The Government also may call an expert witness from the Department of Education to testify about the requirements for medical professionals to maintain their medical licenses; to incorporate professional corporations in New York State; and the continuing education requirements for medical professionals, including matters of licensing and incorporation.  The Government will notify you as soon as we determine who such a witness may be and if we intend to call such a witness.

Finally, we also request that you produce reciprocal discovery pursuant to Rule 16(b)(1)(C) of the Federal Rules of Criminal procedure for any expert witness you intend to call at trial.

Very truly yours,

PREET BHARARA
United States Attorney

By:     /s/
         Daniel S. Goldman
         Edward Y. Kim
         Daniel S. Noble
         Assistant U.S. Attorneys
         (212) 637-2289/2401/2239

D4JCZEMCF                    Conference

1    government would propose the week of May 12 and perhaps we

2    could back out some sort of severance motion schedule from

3    that, as well.

4              THE COURT:  Yes.  I think that sounds about right.

5              Could we have a conference on Wednesday, May 15, the

6    afternoon, 2:00?

7              MR. BACH:  That's for the people in the first trial?

8              THE COURT:  Yes.  For the ten people.  Just to be

9    clear for the record, that would be the ten people who I think

10   presumptively in the first group to be tried on June 17,

11   subject to any motions.  Those are Zemlyansky, Danilovich,

12   Barukhin, Ostrumsky, Treysler, Shuman, Lipis, L-I-P-I-S,

13   Gabinskaya, Geris, G-E-R-I-S, and Mr. Vitoulis,

14   v-I-T-O-U-L-I-S.

15             So Wednesday, May 15, 2:00.  A conference.  It will be

16   a pretrial conference, and severance motions.  We have to do

17   two weeks before and opposition one week before.

18             MR. GOLDMAN:  That's fine with the government.

19             MR. NEWMAN:  James Newman for Mr. Ostrumsky.

20             I've got a number of housekeeping scheduling issues

21   I'd like to raise, but regarding the severance motion, I'm

22   not -- my understanding is that the government anticipates that

23   after there's a decision on some of these motions, there will

24   be a period of time when there could be some renewed plea

25   discussions, and afterwards, I suppose the government would

64

D4JCZEMCF                    Conference

1    then have a revised list of who was in that first group; at

2    which point then there could be a discussion about severance.

3              So I guess what I'm going to propose is that there

4    should be some period of time before our conference on May 15,

5    when the government could let us know who they propose to be in

6    that first group.  Perhaps a week before that.

7              THE COURT:  Well, I assume it's everyone in the ten

8    who hasn't pled.

9              MR. GOLDMAN:  Right.  We don't have a tremendous

10   amount of time and we think it will be helpful if we can

11   provide a list a couple of days before that conference, but as

12   I understand it, there may be some non-RICO defendants who want

13   to move to severe from RICO defendants regardless of what the

14   government proposes.  Perhaps just as to that discrete issue,

15   the Court would want to entertain briefing.

16             THE COURT:  You mean, as opposed to other severance

17   bases?

18             MR. GOLDMAN:  Well, there's a Casamento base of

19   severance, which the Court has indicated that the Court wants

20   to cap it out at six or so.  We are at ten.  If no one pleads

21   guilty, the government will suggest the six, that it would

22   recommend to go --

23             THE COURT:  Right.

24             MR. GOLDMAN:  -- and sever out the other four.  It may

25   render whatever severance motions have been made prior to that

                     SOUTHERN DISTRICT REPORTERS, P.C.

                            (212) 805-0300

D4JCZEMCF                    Conference

1    move.  It may not.  In any event, if the Court -- perhaps the
2    Court doesn't want briefing on RICO versus non-RICO, but I
3    think that's -- I don't want to speak for everybody here, but
4    that's, I understand, one possible severance motion that may --
5              THE COURT:  I want to give the defendants a chance to
6    brief severance motions, if they wish.  It's the expectation
7    that severance motions are going to precede that conference.
8              I want severance motions due May 1st.  Government
9    opposition due May 18th.  All right.  I suppose we're not going
10   to have the benefit of the government's view about who is
11   really in that final group when making a severance motion.  I
12   could try to move this back a bit.
13             MR. GOLDMAN:  Well, the reason to have the severance
14   conference on May 15, as it stands right now, is that ten
15   people cannot go to trial.  If there are other reasons that
16   defendants would want to sever, it may make sense to brief
17   that.
18             If it is simply a numbers game, the government will
19   make a suggestion prior -- a couple of days prior to that
20   conference.  So I think what Mr. Newman is talking about is
21   just general severance, because of Casamento-related issues.
22             There are other defense counsel who have said -- not
23   Mr. Newman -- who had said to me there may be motions coming
24   down to sever the non-RICO defendants from the RICO
25   defendants, which would provide a separate basis for the Court

                   SOUTHERN DISTRICT REPORTERS, P.C.

                          (212) 805-0300

D4JCZEMCF                    Conference

1    to consider severance.

2              THE COURT:  Right.  And that would be perhaps

3    irrespective of Casamento issues.

4              MR. GOLDMAN:  Exactly.

5              THE COURT:  Separate from it.

6              MR. NEWMAN:  Judge, I don't want to speak for

7    everybody.  I just want to be clear on what's contemplated.

8              Are we talking about severance motions, on whatever

9    grounds, May 1st?

10             THE COURT:  Actually, I can make it May 3rd, and then

11   give the government a week to respond May 10th.  I mean, that

12   gives me enough time before the 15th.  So any severance motion,

13   severance-related motions May 3rd, and then government's

14   response May 10th.

15             MR. NEWMAN:  That's fine with me, Judge.

16             MR. GOLDMAN:  I think I will get to a couple of issues

17   that he discussed earlier.

18             MS. KEDIA:  Sarita Kedia for Dmitry Lipis.

19             I fall within the group of non-RICO defendants who

20   have been proposed for the first trial group.  Could I make

21   this suggestion, because I will be making a motion, presuming

22   that my client is still within the first trial group that the

23   government's proposing.  I will be making a motion to sever him

24   from the defendants who are charged in the Rico, but may I make

25   this suggestion; that prior to the severance motion being filed

D4JCZEMCF              Conference

1    perhaps earlier that week -- I believe May 3rd. It's a

2    Friday -- and perhaps by that Monday, the government will

3    inform us as to which five of the ten -- presuming it hasn't

4    received pleas from any of the ten, which five of the ten it

5    actually intends to take to trial on June 17. That may

6    eliminate the need for some of the severance motions. And I

7    think by that date, the government should have a good idea of

8    who's actually -- I mean, obviously pleads guilty, but who has

9    pled guilty by that point in time, obviously, is a couple of

10   weeks from now and your Honor will have an opportunity to

11   terminate the motion.

12            MR. GOLDMAN: We would object to that, your Honor.

13            We think it's already a very cramped schedule. It

14   does not leave time for the plea discussions that we had

15   anticipated. Ms. Kedia's motion will be based on a separate

16   basis and it may be rendered -- ultimately, it may be rendered

17   moot; it may not. But the concept here is to give a couple

18   week window for any defendants who want to discuss pleas

19   following the Court's ruling, which may not come today. I

20   imagine it won't. And so the Court would like some time to

21   consider the argument and the motions and make rulings, and to

22   submit something prior to May 3rd gives us very little time to

23   contemplate the plea discussions that are the purpose of the

24   May 15 conference.

25            THE COURT: Yes. I'm not going to inquire at this

68

D4JCZEMCF                    Conference

1   point.   Depending on when I rule on the motion, I'll consider
2   that.

3              Any other housekeeping matters?

4              MR. GOLDMAN:   Yes, your Honor.

5              Mr. Newman and I had a discussion earlier this week.
6   We wanted to make sure that everybody was aware of some of the
7   dates that we discussed with Mr. Newman in terms of
8   disclosures.

9              Mr. Newman asked for a couple of things:   One, when we
10  would be giving expert notice, if any, and whether we can
11  identify additional -- the universe of recordings, particularly
12  wiretap recordings that we would potentially be introducing at
13  trial.   I may be amending what I told Mr. Newman, but --
14  slightly -- we would propose that a detailed expert notice or
15  expert notices be provided by May 3rd.   In that expert notice,
16  we will try to identify the set of documents that any expert
17  reports will be based on, and we'll give as detailed an outline
18  of what we anticipate the topic of testimony for the expert
19  witnesses to be, which should put the defendants on sufficient
20  notice to be able to enlist their own experts to review the
21  same materials and respond.   We will try to pinpoint when we
22  will be able to provide expert reports with that notice on
23  May 3rd.

24             Also, on May 3rd, we will identify the universe of
25  recordings that we would intend to introduce, which is most

D4JCZEMCF                    Conference

1    important for the Russian recordings, so that the defendants

2    can begin to address some of the translation and transcription

3    materials.

4            We indicated, I think, in our opposition that 30 days

5    in advance of trial, we will submit 404(b) and a RICO

6    enterprise letter.  That's May 17.  We intend to do that.  On

7    May 31st, which is a Friday, we will provide 3500 material in

8    our possession at the time, as well as a preliminary exhibit

9    list and the accompanying exhibits.

10           I think that is all for the first trial, unless

11   Mr. Newman has more.

12           MR. NEWMAN:  Yes, I have a number of comments, Judge.

13           First, we're going to 3500 material.  I'm aware of the

14   practices in this Court, and I know what the obligations are

15   and what your authority is.

16           The government's proposing two weeks, I guess, or 20

17   days or something like, about two weeks before trial.  I'd ask

18   the Court to urge the government to consider doing that three

19   weeks instead.  And that encompasses the exhibit list, too.

20   I'm particularly concerned about the exhibit list, to be

21   honest, because that's -- we're dealing with such an incredible

22   mass of documents here, and I just think that given the

23   complexity of this case and the volume of materials, three

24   weeks would be a lot fairer place for us to be.

25           And I do have one or two questions I think the

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

D4JCZEMCF                    Conference

1    government may be able to answer right now about the exhibit
2    list.

3          In the past, we've been here.  The government has
4    indicated that they were in the process of reviewing the
5    computers and all the electronic evidence and at that time --
6    it is months ago, I think -- they said they were not relying on
7    anything in there at that point, but, of course, they reserve
8    the right to continue their investigation.

9          So at this point, I'm asking if we know today whether
10   there are additional materials in the computers that they
11   intend to use.  And I understand that can change, but I wonder
12   if Mr. Goldman can just speak to that.

13         THE COURT:  I'll ask Mr. Goldman to get an update on
14   computer searches.

15         MR. GOLDMAN:  Where we are with the computer searches,
16   the defendants have had access to all the computers for some
17   time now.  So our obligations under the rules of discovery have
18   been complied with.  As we are going through the computers, we
19   are marking things that we think would be relevant and
20   potentially exhibits at trial.  So we do anticipate introducing
21   materials from the electronic media at the trial, I think is
22   the short answer.

23         MR. NEWMAN:  And given that, and the huge amount of
24   computer evidence, I think that heightens the need to have an
25   exhibit list at an earlier time than two weeks.

71

D4JCZEMCF              Conference

1        So my request is that be produced three weeks in
2    advance instead of two weeks, along with the 3500 material.
3        MR. GOLDMAN: Your Honor, could I just -- could we ask
4    Mr. Newman, normally the reason to provide the exhibit list and
5    exhibits is to provide defense counsel with enough time to
6    challenge the admission of the evidence in court. Two weeks
7    would be more than enough time to review the exhibits and
8    challenge them.

9        This will relate, I think, a little bit potentially to
10   the motion to suppress the search warrant argument that is
11   forthcoming, but if there are things outside of the scope of
12   the search warrant, or things that otherwise don't have
13   relevance or otherwise are inadmissible, then the defense can
14   object to that. We don't need, and are not under any
15   obligation, to draw a road map for the defense as to what our
16   case is. And two weeks is more than enough time to review the
17   materials in advance of a trial.

18       THE COURT: The exhibit list will include materials
19   from the computers, presumably, from the computer searches?
20       MR. GOLDMAN: Presumably, yes. Of course, if it's two
21   weeks before trial. We would anticipate, as always occurs -- I
22   don't think Mr. Newman will quibble with this -- that there
23   will be additional exhibits that will surface that we'll use
24   that will follow that date. We'll get a preliminary list and
25   those accompanying exhibits by May 31st, and that will, in

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

72

D4JCZEMCF                    Conference

1    almost all likelihood, include materials from the electronic
2    media.

3            MR. NEWMAN:  A road map is one thing, but we don't
4    even have an idea about which computers might be a source of
5    information that will end up at a trial.  I'm looking for as
6    many alternatives as possible.  Perhaps we could get the
7    government to narrow down the list of the dozens of computers
8    that are there and say, well, we think that these two or three
9    computers will be especially the focus of anything that comes
10   out.  Then we can search them through this database that's been
11   provided and we may get some help there.

12           I still think that the exhibit list, itself, is really
13   what we need.

14           THE COURT:  Mr. Goldman, is there any preliminary
15   exhibit list that you can provide earlier than the 31st, say
16   the 24th?

17           MR. GOLDMAN:  Is it possible?  Certainly.  We would
18   proffer not to for a variety of reasons, and we don't think
19   it's necessary.  But, of course, yes, we could do it, but it
20   will be almost certainly less complete, but we can do that.
21   And we can also -- we're always happy to discuss with
22   Mr. Newman, who we've been in regular contact this week on a
23   variety of issues, including the computer searches -- narrowing
24   down the universe of materials that might relate to his client
25   as well.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

D4JCZEMCF                   Conference

1          We provided him with a forensic image of a thumb drive
2    to his client today and that are going to be in further
3    discussions.  So we are very open to discussing things.

4          We understand it's a large mass of material and we're
5    trying to help to focus that to a different category than
6    providing an exhibit list of exhibits.  It's just simply not
7    necessary to do it more than two weeks in advance.

8          THE COURT:  Well, I'm going to ask you to, if you can,
9    provide them on the 24th, a preliminary list to narrow down the
10   computers, to the extent you can, and the preliminary exhibit
11   list, if possible, and then a more complete one on the 31st.
12   The 3500 material will be May 31st first.  And then the other
13   things the government said seem fine.  May 17, which is 30 days
14   before 404(b) evidence; May 3rd for the detailed expert report
15   and the universé of recordings.

16         MR. NEWMAN:  Judge, can I just discuss the expert
17   disclosure for a moment?

18         THE COURT:  Sure.

19         MR. NEWMAN:  I think May 3rd is -- personally I think
20   that's -- that might work, depends on really what the volume of
21   material is coming back.  But I assume on that date we are
22   getting a summary of the experts' possible testimony, and a
23   clear indication about what their -- what materials -- identify
24   what materials the government is relying on.  That's happening
25   on the same date, I assume?

D4JCZEMCF                    Conference

1          THE COURT:  Do you want to address it?

2          MR. GOLDMAN:  That's our goal.  That is our goal.  We

3    can't promise that every single item that an expert will review

4    will be done by then, but that is certainly our goal, and we

5    would like to give ample notice because we know it does take

6    time for defense experts to review things, Judge.

7          MR. NEWMAN:  The other things I wonder, if we can get

8    some information from the government on -- right now is simply

9    what kinds of experts they expect to call.  And I'm asking that

10   because there's going to be -- the defense is going to be in a

11   rush to identify -- possibly identify their own experts, let

12   alone give them time to do their work.

13          I noticed -- well, I guess I always assumed that there

14   would be, at some point, some kind of medical doctor.  I don't

15   know if that's true, but I also heard in today's argument there

16   was a reference to someone from the insurance industry, I

17   think, who might be an expert in practices.  And this may

18   dovetail with a separate issue that Mr. Goldman and I

19   discussed.  I asked him if there was any witness who is likely

20   to be summarizing records.  And he's indicated to me that

21   there'd be someone who'd be doing an evaluation of a sampling

22   of certain records.  And I believe that he was indicating they

23   would be the initial evaluations of the doctors.  And that

24   would yield some kind of statistical analysis.  He'll correct

25   me if I'm wrong, but that's my understanding.  I'm not sure if

D 4JCZEMCF                    Conference

1     this person is an expert, and if he's a statistical expert, or
2     what kind of expert he is, but we're going to need -- again, I
3     get by the May 3rd date.  Whether you call that person an
4     expert or not, I think that we're going to need to know --
5     we're going to need the government to identify the universe of
6     records that are being sampled, in addition to the particular
7     records that are -- that constitute the sample.  But my
8     question right now is simply if the government can identify the
9     types of experts that they intend to use.

10            THE COURT:  Mr. Goldman, can you address that?
11            MR. GOLDMAN:  Yes.  We will identify the records that
12    the experts are reviewing, both in terms of the larger universe
13    of them as well as the sampling.  We do intend to have a
14    medical doctor expert.  We also intend to have expert testimony
15    relating to statistical analysis of patient records.  We, in
16    all likelihood, intend to have an expert from the -- to discuss
17    no-fault law.  And we may also have an expert -- we still have
18    not determined whether we will have an expert, but we may, on
19    the medical doctors' continuing education obligations.

20            MR. NEWMAN:  Judge, this is -- it's difficult to
21    anticipate what these reports are going to look like, but I
22    just want to say, I'm very concerned about having enough time
23    for us to find experts who can, you know, evaluate what their
24    experts are doing, perform their own analysis, and possibly
25    testify.  And I think at least there may well be some motions

D4JCZEMCF                    Conference

1    as to whether or not this is, you know, valid expert testimony

2    in itself when it can comes to, at least, the statistical

3    analysis; maybe the other experts, too. So I think -- I'm just

4    alerting the Court, I think this is going to be something that

5    may be the subject of some briefing.

6            THE COURT:  Well, I guess we'll have to schedule

7    motions in limine, and as part of that, there could be motions

8    related to the experts prior to trial.

9            MR. NEWMAN:  I don't want to take the position today

10   that I know that we're not going to have time to deal with

11   this, but I'm just telling the Court that from my point of

12   view, I can easily see us in a situation where we're hit with

13   some of these expert reports and the opinions and we're going

14   to be asking for more time just to prepare for the trial,

15   because it sounds to me to be complicated. It sounds like it's

16   debatable -- it sounds like it might be debatable about what

17   some of the experts are doing. And if we have to wait till May

18   3rd to raise these issues, we can do that. I just want to

19   mention that. I see these issues coming down the road.

20           MR. GOLDMAN:  It's more than six weeks, your Honor.

21   It's a lot of time, and we are going to provide the direction

22   to already be setting the stage for an adjournment two months

23   in advance of trial, when you will understand what the expert

24   testimony will likely be, and you will get much more detailed

25   notice and the information upon which it is based, more than

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

D4JCZEMCF                    Conference

1    six weeks before trial. Seems to be very premature.

2            MR. NEWMAN: As I said, I just wanted to alert the

3    Court. I see this as a potential problem.

4            Regarding the transcripts, I just want to mention that

5    I've identified one particular consensual recording -- well,

6    the translation service has told me this -- that they find

7    inaudible. There may be some issues regarding the tapes, so

8    we'll address that later.

9            THE COURT: Okay.

10           MR. NEWMAN: That's it.

11           THE COURT: Thank you, Mr. Newman.

12           MR. BARKET: Bruce Barket. We are on the second trial

13   and are really done, other than the Court telling us when we

14   should come back. If you can do that, I, personally, and

15   speaking on behalf of the others like me, would appreciate it

16   and then we can continue with those arguments.

17           THE COURT: I assume you don't need to be here for any

18   of the --

19           MR. BARKET: The suppression.

20           Fraudulent corporation was it for me.

21           THE COURT: Okay.

22           Okay. With respect to those who are not subject to

23   the current motions to suppress, and also are not in the first

24   trial group -- I'm just trying to think -- we should probably

25   have something on the calendar to come back.