UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
——————————————————————————X

UNITED STATES OF AMERICA,

      -against-                                  **12 Cr. 171 (JPO)**

MIKHAIL OSTRUMSKY,

                        Defendant.
——————————————————————————X

**SENTENCING MEMORANDUM ON BEHALF
OF THE DEFENDANT MIKHAIL OSTRUMSKY**

James E. Neuman, Esq.
**Attorney for Defendant**
      **Mikhail Ostrumsky**
100 Lafayette Street
Suite 501
New York, NY 10013
(212) 966-5612

**Preliminary Statement**

This memorandum is submitted on behalf of Mikhail Ostrumsky, whose sentencing is currently scheduled for December 11, 2013 at 4:30 p.m.  Attached hereto are letters from Mr. Ostrumsky's friends and family (collectively Exhibit "A").  The main purpose of this memorandum is to set forth Mr. Ostrumsky's personal background, clarify the scope of his criminal conduct and compare him with his co-defendants.  Taking all of that into account, our position is that Mr. Ostrumsky should be sentenced to a term considerably below the stipulated guideline range of 70-87 months.

**Personal background**

Life before the charged conspiracy

Mr. Ostrumsky was born on February 25, 1970, in the Ukraine, the only child of Alexander Ostrumsky and Sima Uzefpolskaya.  PSR ¶ 83.  Though his parents divorced when he was a toddler, he maintained close relations with both of them, as well as various half-siblings.  His childhood was "normal" for one living in the Ukraine.  PSR ¶¶ 84-85.  He completed high school and the equivalent of three years of college.  PSR ¶ 97.  In 1989, at the age of 19 years old, he immigrated to New York, along with grandparents, an aunt and two cousins. PSR ¶ 89.

In 1993, Mr. Ostrumsky married Rozana Ivanov.  Together, they had one daughter, Michelle Ostrumsky, who is now 19 years old.  Though the couple divorced after seven years of marriage, they remained on amicable terms and Mr. Ostrumsky kept – and continues to keep – in close contact with Michelle. ¶ 86.  He stayed in New York City and became a citizen in 1996.  PSR ¶ 89.   Thereafter, in 2005, he married Yelena Kassik Ostrumsky.  The two of them had two children: a daughter who is now eight years old and a son who is now four years old.  By all accounts, the marriage was, and

is, quite happy and Mr. Ostrumsky has enjoyed a very good relationship with his whole family,  PSR ¶¶ 87-88, as evidenced by the numerous letters attached to this memorandum.

Upon entering this country, Mr. Ostrumsky demonstrated a proclivity for obtaining lawful employment.  Initially, he worked in a restaurant for 2-3 years.  Then for approximately ten years, he was employed as a distributor for Sabrett hotdogs.  That position ended only when Sabrett changed its business model and began selling their product directly to supermarkets. PSR ¶¶ 102-03. Sometime in the mid to late 1990s, a cousin of his introduced him to the business of billing for medical services.  The two of them began doing billing work for doctors' offices, servicing many different offices in the New York metropolitan region.  At the peak of that business, Mr. Ostrumsky earned approximately $120,000 per year.  PSR ¶ 101.

But about ten years ago, this cousin passed away in a tragic car accident.  The event devastated Mr. Ostrumsky.  Withou his cousin, the business suffered and the customer base eroded. As a result of the emotional loss and business problems, Mr. Ostrumsky suffered a nervous breakdown and experienced insomnia, anxiety and depression.  He sought counseling from a mental health professional and was prescribed sleeping pills and anti-depressants.  He stayed on medication for four years and continued therapy sessions for about five years.  PSR ¶ 92.  Largely because of those psychological issues, Mr. Ostrumsky did little work from 2002-2006, subsisting on his savings and his wife's income.

In 2007, Mr. Ostrumsky finally began to emerge from his depression and started to seek work again.  He read billing manuals and learned software programs in order to revive his billing business. He took over a company started by his uncle, USA Renorum, which was originally meant to be an export/import business, and transformed it into a billing company.  He approached his old customers

and and solicited jobs from them.  He gradually found clients at various locations in the New York City metropolitan area.  His official office was at his home residence, but most of his work was performed on-site.  Occasionally, he even employed part-time helpers.  Yet, the company was not particularly profitable.  From 2007-2012, he only earned about $40,000 per year.[1]  PSR ¶¶ 100, 106.

In good times and bad, Mr. Ostrumsky remained a devoted father and loyal friend, always ready to offer guidance and assistance, as indicated in the annexed letters.  For example, his sister, Dina Andre, writes that:

> "Mikhail is a kind, and extremely helpful human being, who always comes through for family and friends both in good times and in a crisis and is always the first to lend a hand to others, especially in difficult times.  Let me give one of many examples.  I had to undergo an inguinal hernia surgery recently, and I can't tell you how helpful Mikhail has been in this terrible time. He was the first to start helping me get through it, he would shop for me and make me food, help clean up and help me take care of my son.  Even though he has three children of his own, he was able to help me take my son to school and pick him up after to bring him home, and help him out with his homework and other activities so he would not fall behind while I recovered.  In this difficult time, Mikhail was there to help every day ****" (emphasis added).

Similarly, his niece, Alina Kurman writes that:

> "My uncle has not only been a role model to me, but has been a father figure for the past ten years since my father passed away.  Mikhail has taken charge to be the lead person in my life who sets a great example for me.  He has been helping my mother and myself in many different ways.  From taking care of me in my teenage years, to aiding my mother with husband duties, to maintaining the house that we live in, to helping my mother manager her business, and of course, to our unconditional love that we have for each other.  He is the type of

---

[1]

This sum includes all amounts he received from the no-fault clinics and providers that are referenced in the indictment

person that I can call a hero, a person who you can call for help and count on any time of day \*\*\*\*" (emphasis added).

Nadia Dribinskaya, a friend, recounts how Mr. Ostrumsky came to her aid when she underwent financial difficulties:

> "When Mikhail found out what is going on with me, he offered his help, and began to help me look for a job and drive me to endless interviews \*\*\*\* At one point things got so bad I was forced to borrow money \*\*\* No one helped but Mikhail. He gave me the money and trusted me. He never reminded me about that debt and even though it took a few years to pay him back he never made me feel bad about it. Later on I found out that in order to lend me money he went and borrowed it himself from another friend \*\*\*\*" (emphasis added).

A cousin, Larisa Kurman, recalls how Mr. Ostrumsky helped her after her husband died in an accident in 2003, as well as during the aftermath of Hurricane Sandy:

> "Mikhail became a father-like figure to my own daughter. My daughter has recently got married but Mikhail and her still share that father-daughter relationship \*\*\*\* During the last year tragedy and devastation of Hurricane Sandy, when my house was seriously destroyed, Mikhail gave us his hand, working around the clock, cleaning the debris and then slowing rebuilding it. Without him, that daunting task was unachievable" (emphasis added).

Other friends, Igor and Tamilla Dovman, write about his help after a fire:

> "In December 2004, we had fire in our house. Mikhail was always there for us: saving whatever possible from our house, helping us with moving to our rental. When we started to renovate our house, Mikhail was with us every step."

Another friend, Leonid Galitsky, offers a similar story:

> "When I opened my store he spend every minute he could helping me build it putting shells in coming up with delicious dishes I could sell. He is the type of person I can always call for any advice and no matter how busy he is he still would try to find time to help me \*\*\*\* He was the biggest help after the hurricane flooded my store and I lost so much I didn't even know where to start and how to begin rebuilding

-4-

it.  He was with me holding my hand and telling me it would be ok"
(emphasis added).

Many others, such as Emily Klyachman, describe Mr. Ostrumsky as a "very loyal friend" who is a

"man of his word."  Rabbi Avrohom Winner's letter demonstrates that Mr. Ostrumsky's assistance

extended beyond just his relatives and close friends:

> "I have known [Mr. Ostrumsky] for some time now and found him
> and his family to have a profound sense of community.  He and his
> family are involved with our outreach programs to help Russian
> immigrants acculturate into their new country.  They have been a role
> model to many other families of the same background and helped
> bring them closer to our Jewish roots, something that was denied to
> them in Communist Russia.
>
> "Michael is presently a broken person, he is remorseful for the errors
> committed. We hope he overcomes this difficult period and can soon
> get more involved for the betterment of the community."

Especially touching are the letters from Mr. Ostrumsky's immediate family.  His wife,

Yelena, makes clear that he has remained very close not only to the children they have had together,

but also his ex-wife and their child:

> "He is very close with all his kids and always puts them and their
> needs first Mikhail plays a big role in all his kids lives.  He drives our
> young kids to school every morning even if he has 104 degree fever
> to show them that they can count on him, always.  He is in charge of
> homework and activities and his kids rely on him daily for both big
> and little things, especially in these young years **** Mikhail has
> many friends in the community.  As an example, during Hurricane
> Sandy, Mikhail helped our neighbors.  He made sure all were safe and
> walked up with a fire extinguisher to the last 18th floor to calm down
> the neighbor who smelled something burning *** There are many
> other unselfish deeds that can demonstrate the kind of caring and
> unselfish person he is.  When he found himself in this unfortunate
> situation, we had many people coming to us offering any kind of help
> we needed **** I feel very lucky that I found a man like him to walk
> through life with me.  He is not just my husband, he is my best friend
> and life without him is not something any of us can imagine.  Our

> daughters feel he is a super hero because in their eyes, there's nothing
> that he cannot do.   Through all these years, Mikhail has been a
> wonderful husband, father and friend ****" (emphasis added).

These sentiments are echoed by his eldest daughter, Michelle Ostrumsky:

> "When I was six years old my parents got divorced.  Yet in the last
> thirteen years I have never felt as if my parents have been divorced.
> My father has never been an absentee father.  He was always there for
> me and always involved in everything that was going on in my life.
> He has always been a part of my life as well as my mothers.  Even
> after getting divorced, my father has maintained a great relationship
> with my mother for the benefit of my growth. ****
>
> "Life without my father being around is not imaginable.  Not only for
> me but also for his wife, my two younger siblings *** He is our role
> model and our hero.  He is always there to point us in the right
> direction and teaching us to never give up.  He always puts his
> children first.  My father plays a huge role in all of our lives ****
>
> "My father has never given me a reason to be disappointed with him.
> He never let me down and for that I appreciate him more every day.
> He inspires me everyday to be a better person.  I cannot compare my
> father to anyone in the world because to me he is very special ****
> [He] is a loyal, caring, and devoted father, husband, son, cousin and
> friend.  He has played a big role in many peoples' lives but none like
> my siblings and myself.  He sets a perfect example of what family
> should be like.  I love him so much that words can't even describe"
> (emphasis added).

The criminal conduct

As this Court is well aware, the essential theory of the prosecution was that two types of

fraud occurred: "fraudulent incorporation" and billing for unnecessary or unprovided services.  Now

that one trial has occurred and many pleas taken place, though, it is apparent that not all defendants

engaged in both types of fraud, were involved with an equal number of clinics, providers or co-

conspirators for an equal amount of time, profited to the same extent or even understood the full

scope of the various schemes.

With regard to Mr. Ostrumsky, the government's position is that he co-owned two no-fault clinics: NTT Medical P.C. ("NTT") and DST Medical P.C. ("DST").   In fact, NTT existed for a significant period of time before he became involved in it.   NTT was incorporated in April, 2008 and began operations the following month, relying on funds invested by Boris Treysler and others.   In late 2008, a friend introduced Mr. Ostrumsky to providers at the NTT location and to Treysler.   He was informed that Treysler was the office manager and that Dr. Nathan Levin was the owner.   Mr. Ostrumsky intended to obtain business from NTT, but because the prospects were dim at the time, he left without entering into any arrangements with anyone there.

Sometime around June, 2009, Mr. Ostrumsky returned to NTT, having heard that they were experiencing problems and needed help with billing.   Initially, he worked without compensation, hoping to demonstrate that he could provide a valuable service.   Eventually, Mr. Ostrumsky entered into agreements with the various providers at NTT.   They agreed that he would assist with billing and would submit invoices for that work.   His work mostly consisted of advising providers about proper billing practices, such as what codes should be used.   Often, he dealt with denied claims, deciding whether to resubmit bills with additional documentation or to proceed to arbitration.   He kept track of billing by entering information into a billing program. Sometime around August, 2009, he submitted his first invoice to NTT.

But Mr. Ostrumsky also had an understanding with Mr. Treysler, and by extension Dr. Levin, about sharing profits.   Essentially, the understanding was that Dr. Levin would receive 20% of the profits and Mr. Treysler would receive the remaining 80%.   Further, Mr. Treysler was supposed to give Mr. Ostrumsky 20% of his share.   Still, though he had a profit sharing arrangement at NTT, Mr. Ostrumsky did not function as an owner in many respects.   He did not make decisions as to who to

-7-

hire and fire.  He did not negotiate rent or sign a lease for NTT.  He did not invest his own money into the operation of NTT.  He did not open or control NTT bank accounts.  He did not sign checks. He had minimal involvement with runners.[2]  He did not use check-cashing companies or other companies to facilitate money laundering.  He did not structure payments to avoid financial reporting requirements.  Nor did he actively participate in billing for unnecessary or unperformed services.[3]

Mr. Ostrumsky had a larger ownership interest in DST, but it was in existence for a shorter period of time.  At some point, he and Mr. Treysler learned that providers at a clinic on Utica Avenue owed money, were seeking new funds and also looking for a new doctor.  Mr. Ostrumsky and Mr. Treysler arranged for a third person, David Feinerman, to loan money to Dr. David Thomas, who agreed to take over the role as the doctor on the premises.  DST opened sometime in 2010, with the understanding that Mr. Ostrumsky and Mr. Treysler would share the profits equally.

Mr. Ostrumsky's role was similar to what he did at NTT: i.e., he oversaw billing, created programs for the entry and tracking of billing information and addressed contested claims.  Still, he did not participate in billing for unprovided or unnecessary services.  As with NTT, he did not negotiate rent, sign leases,  invest his own money or open or control DST bank accounts.  Contrary to the actions of some co-defendants, such as Mr. Treysler, Mr. Ostrumsky did not use check-cashing

---

[2]

Linda Tadder was the individual primarily responsible for paying and interacting with runners.  T172, 204.

[3]

During plea negotiations, the government argued to the defense that, during one tape-recorded encounter, Mr. Ostrumsky directed a runner to advise a patient – who was actually an undercover officer – to undergo unnecessary treatment.  We dispute this interpretation of the encounter.  The transcript indicates that the conversation is very brief. At one point, Mr. Ostrumsky tells the runner that "the next time we're going to need to [UI] that he is here to do the test."  But the transcript omits the context of the conversation.  By the time of that conversation, the undercover/patient had made and canceled several appointments for testing.  Mr. Ostrumsky had been advised of the cancellations and asked to insure that the undercover/patient keep his scheduled appointment.  In any event, even accepting the government's interpretation of that particular conversation, we strongly disagree with the claim that Mr. Ostrumsky routinely participated in overbilling, or that he was even aware of routine overbilling.

companies or other companies to facilitate money laundering, let alone structure payments to avoid reporting requirements.  And his involvement with runners remained minimal.

In any event, DST did poorly.  Not enough patients came and the business never generated a profit.  After 6-7 months of operation, DST closed.  Mr. Ostrumsky and Mr. Treysler transferred their interest in DST to Michael Danilovich and Michael Zemylansky, who changed the name of the clinic to Community Medical P.C., but continued to operate it from the same location.  Mr. Ostrumsky's role and connection to Community was essentially limited to picking up money to help pay off the loan to Dr. Thomas.

<u>Plea</u>

On June 10, 2013, Mr. Ostrumsky pled guilty to Counts Two and Six of the indictment. Regarding Count Two, he stated that, between 2009-2012, he willfully agreed with others to participate in a scheme to obtain money from insurance companies under false pretenses. Specifically, he acknowledged that he helped establish and operate the DST clinic, which was purportedly owned by a doctor but was in fact owned by himself and others.  Further, he said that he submitted claims to insurance companies falsely indicating that a doctor owned the clinic, but he actually helped run it and had an agreement to share in the profits of the clinic.  6/10/13 trans, pp.15-16.  With regard to Count Six, he stated that, during the same period of time, he willfully agreed with other to participate in financial transactions with the proceeds of the health care fraud.  Specifically, he said that he used some of the money that was received from insurance companies to pay runners to bring patients into the clinics, and that he did so in order to conceal the source of the money and promote the health care fraud scheme.  6/10/13 trans, p.17.

<u>The offense conduct described in the pre-sentence report</u>

The description of Mr. Ostrumsky's offense conduct in the pre-sentence report is brief and contained entirely within paragraph 55.  The report states simply that Mr. Ostrumsky, together with Mr. Treysler, "owned, operated and controlled multiple no-fault clinics and referred patients to modality clinics owned, operated and controlled by Mikhail Zemylansky and Michael Danilovich, among others, in return for cash kickbacks." In addition, the report states that Mr. Ostrumsky and Mr. Treysler laundered the proceeds of their criminal activity." PSR ¶ 55.  This description is somewhat misleading in suggesting that Mr. Ostrumsky's ownership interest was more than two clinics.  Moreover, Mr. Ostrumsky did not personally receive cash kickbacks from either Mr. Zemylansky or Mr. Danilovich.

Most of the other paragraphs in the pre-sentence report offer general descriptions of the schemes, without identifying which defendants committed which acts.  To the extent that those general descriptions apply to other individuals, we have no objection.  But to the extent that they are meant to apply to Mr. Ostrumsky or the clinics in which he had an interest, however, they contain many inaccuracies or overstatements.[4]

For example, ¶ 40 states that the no-fault clinics "routinely billed" insurance companies for treatments that were either "never provided" and/or were "unnecessary."  Though occasional incorrect billing may have occurred, we disagree that it was "routine" for the clinics associated with Mr. Ostrumsky to bill for treatments that were "never provided" or were "unnecessary."   In fact, a number of government witnesses testified at the recent trial that, at least at some clinics, billing was

_____

[4]

As of the date of this memorandum, the revised PSR has not been received.  All references and objections are to the original PSR.

-10-

only for services that were actually provided.  *See e.g.,* T1665, 1846; *cf.,* T171.  More to the point, Linda Tadder, the office manager at DST and then Community, acknowledged that Mr. Ostrumsky in particular wanted to be "careful" about billing and did not want to "overbill." T393.

Paragraph 42 alleges that the no-fault clinic controllers invested the initial funds to establish the clinics, identified the locations of the clinics, negotiated rent, paid for equipment and received most of the proceeds from the clinics.  None of these allegations are accurate descriptions of what Mr. Ostrumsky did.   While he helped arrange for a loan that funded DST, he did not invest any of his own funds to establish any of the clinics.  He did not negotiate rent. He did not pay for equipment.  He did not identify the locations of any clinics.  In fact, the clinic where Mr. Ostrumksy worked for the longest period of time – NTT – existed for many months before be became associated with it.  Most importantly, he did not receive most of the proceeds.  To the contrary, he received a very small percentage of the proceeds from the clinics, far less than what the doctors received (and apparently much less than what owners of other no-fault clinics received).[5]

Paragraph 43 begins with the statement that the no-fault clinic controllers "arranged for other similarly fraudulently incorporated entities to provide excessive and unnecessary medical treatments based on referrals from the no-fault doctors ***" Mr. Ostrumsky did not personally make any such arrangements.  Later, this paragraph adds that the no-fault clinic controllers "received cash kickbacks for each referral" from those who controlled the modality clinics.  Mr. Ostrumsky rarely received kickbacks from anyone, however.  Further, the fact that kickbacks were paid to some individuals

---

[5]

    Mr. Ostrumsky estimates that the total amount he received from the no-fault clinics and modality clinics associated with him, during the entire period of the indictment, was between $40,000-$50,000.

does not mean that the services in question were not necessary, as Linda Tadder acknowledged during the trial.  T494.

In addition, ¶ 45 alleges that lawyers paid the clinic controllers approximately $1,000 for patient referrals.  Mr. Ostrumsky, however, never received cash kickbacks from lawyers.  This paragraph also says that lawyers often encouraged the patients "to receive more treatments to support their personal injury cases."  Mr. Ostrumsky was unaware of such activity, if it occurred.  Further, ¶ 46 asserts that the no-fault clinic controllers had actual control of the clinic bank accounts, though doctors were the signatories.  While Mr. Ostrumsky may have advised others that certain bills should be paid, however, it is not true that he had "control" of any clinic bank account.  Finally, paragraphs 47-49 discuss various types of money laundering, such as using check cashiers, writing checks to shell companies and taking clinic funds for personal purposes.  Mr. Ostrumsky never personally engaged in any of that specified conduct.

<u>The guideline calculation</u>

The guideline calculation set forth in the pre-sentence report is consistent with that stipulated to by the parties in the plea agreement.  The probation office determined that: the base offense level is 28, on the ground that the loss amount was between $2,500,000 and $7,000,000, pursuant to U.S.S.G. § 2S1.1(a); a 2-level upward adjustment applied because Mr. Ostrumsky was convicted of 18 U.S.C. § 1956(h), pursuant to § 2S1.1(b)(2)(B); a 3-level reduction applied for acceptance of responsibility, pursuant to § 3E1.1(a) and (b); thereby yielding an adjusted offense level of 27.  PSR ¶¶ 70-79.  Because Mr. Ostrumsky has no prior juvenile or adult convictions and zero criminal history points, the probation office found that he was in criminal history category I, with a guideline

range of 70-87 months.  PSR ¶¶ 80-82, 108.  The PSR also reflects the fact that the parties have stipulated to restitution in the amount of $2,815,622.93.  PSR ¶ 65.

<u>Post-arrest activity</u>

Though he has not seen a mental health professional for several years, Mr. Ostrumsky still suffers from insomnia and other medical problems.  He takes medication for hypertension, has bulging and herniated discs in both his lumbar and thoracic spine, and also has meniscus tears in both knees. PSR ¶ 91.  Since his arrest, his alcohol consumption has increased.  He says that he now drinks 1-5 shots of vodka a day.  PSR ¶ 94.  He has never attended a treatment program, but it appears plain that he would benefit from one.  His wife believes that he has a drinking problem, noting that he often drinks by himself and "has a difficult time walking away from a bottle until it is empty." PSR ¶ 95.

Still, Mr. Ostrumsky has worked steadily while this case has been pending.  Since April,, 2012, he has been employed full-time at the Orange Grill restaurant in Brooklyn, New York.  His job entails numerous responsibilities, including cook and manager.  PSR ¶ 99.  In a letter, his employer confirms that Mr. Ostrumsky is considered a hard and cooperative worker, writing:

> "Mikhail is very friendly, respectful, and has a great personality.  He shows great social skills and has a great ability at accomplishing assigned tasks.  He is never late to work and is always ready to lend a hand to anyone who needs his help."

Most important, Mr. Ostrumsky continues to enjoy unwavering support from his family and many friends.   These letters speak for themselves, should be read in their entirety and would be diminished by any attempt to summarize them.  Suffice it to say for now that the letters vividly demonstrate that Mr. Ostrumsky has been an especially devoted father, loyal friend and a person with

-13-

a well-earned reputation for assisting those in need, whether they are friends, family members or just people in the community.  There is no question that he will be sorely missed during any period of incarceration.


## POINT I

### THE COURT SHOULD IMPOSE A SENTENCE SIGNIFICANTLY BELOW THE STIPULATED GUIDELINE RANGE

The very first sentence of § 3553(a) declares that the court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2 of this subsection."  § 3553 then directs the sentencing court to consider "the nature and circumstances of the offense and the history of the defendant," as well as the need for the sentence:

> "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

Among other factors that must be considered are "the kinds of sentences available," such as community service or home detention, (subsection 3), the sentencing guidelines (subsection 4), and the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar crimes (subsection 6).  *See generally, United States v Salinas,* 365 F.3d 582, 589 (7th Cir. 2004).

While courts must determine and take into account the advisory guidelines, courts may not presume that the guideline range is reasonable.  *See, Gall v United States,* 552 U.S. 38, 50 (2007);

*see also, Nelson v United States,* 555 U.S. 350, 351-52 (2009); *United States v Adelson,* 441 F.Supp. 2d 506, 515 (S.D.N.Y. 2006).  Indeed, unlike the pre-*Booker* regime, courts need not find that a particular § 3553(a) factor is "extraordinary" in order to justify a below-guideline sentence.  *See, United States v Rita,* 551 U.S. 338, 351 (2007).  For example, even where a defendant has no "special mitigating circumstances, such as outstanding service to country or community," a below-guideline sentence may be justified merely because the court disagrees with the guidelines.  *See, Spears v United States,*  555 U.S. 261, 263-64 (2009).

At the same time, it is imperative that courts consider each defendant's unique history and characteristics.  As Judge Rakoff has remarked:

> "[S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hithereto, it should be at the moment of his sentencing, when his very future hangs in the balance.  This elementary principle of weighing the good with the bad, which is basic to all great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant." *United States v Adelson,* 441 F.Supp. 2d at 513-14, *supra.*

Simply put "the punishment should fit the offender and not merely the crime." *Pepper v United States,* 131 S.Ct. 1229, 1240 (2011).  Thus, courts ultimately must make an individualized assessment based upon all of the relevant facts and circumstances and tailor the sentence in view of all the statutory concerns.  *See generally, Gall v United States,* 552 U.S. at 50, *supra*; *see also, United States v Peugh,* \_\_\_U.S\_\_\_, 133 S.Ct. 2072, 2080 (June 10, 20130); *Kimbrough v United States,* 552 U.S. 85, 1010 (2007); *United States v Jones,* 531 F.3d 163, 182 (2nd Cir. 2008).

Our position - simply stated – is that Mr. Ostrumsky should be sentenced to a term substantially below the stipulated guideline range.  More specifically, we submit that his criminal conduct was less extensive than many of his co-defendants – particularly Mr. Treysler, who was sentenced to a term of 42 months of imprisonment – thereby warranting a shorter period of incarceration.

The co-defendants

To place Mr. Ostrumsky's conduct in the proper context, it is instructive to consider the range of conduct by his co-defendants.  On one end of the spectrum are individual providers like Chad Greenshner, Pavel Poznansky and Constantine Voytenko.  Each of them admitted to billing for unperformed or unnecessary services, with loss amounts between $200,000 and $400,000 and a guideline range of 18-24 months.  Mr. Poznansky and Mr. Voytenko were sentenced to six months of home confinement and three years of probation, whereas Mr. Greenshner was sentenced to six months incarceration, which was 1/3 of the low end of the guideline range.[6]

Somewhat differently situated is Dr. Sergey Gabinsky.  Dr. Gabinsky reportedly formed at least 10 companies so that they could bill insurance companies for treatment.  At his sentencing, the government argued that, "[b]y selling his license, he enabled others to really perpetrate a massive fraud against the insurance companies ***" 9/4/13 trans. p.21. Based upon a loss over $1,000,000, he faced a guideline range of 46-57 months.  Though this Court found that he had breached his trust

---

[6]

At sentencing, the government emphasized that, as a person with a license and specialized training, Mr. Greenshner should be held to a higher standard.  7/1/13 trans, pp. 17-21.   The government has made similar arguments against other individuaks, such as Vladmir Grinberg.

-16-

and profited in the process, this Court sentenced him to 24 months of imprisonment and $2,029,916.68 in restitution.

Apparently considered more culpable by the government was Dmitry Slobodansky, a so-called "modality controller," who pled guilty to a plea agreement with a stipulated loss amount of $494,000 and faced a guideline range of 37-46 months.   At his sentencing, the government argued that Mr. Slobodansky deserved a lengthy sentence since he had, *inter alia*: attempted to evade law enforcement by using multiple corporations; exercised oversight in connection with no-fault clinic owners; coordinated kickback arrangements; wrote blank checks with the intention that they be cashed by check cashiers to conceal and extract profits; orchestrated the day-to-day operations of clinics; and made deals whereby other individuals opened bank accounts.   Nevertheless, the court imposed a sentence of 21 months of incarceration, representing about ½ of the middle of his applicable guideline range.[7]

Also relevant is Andrey Anikeyev, who stipulated to a loss amount over $4,000,000 and faced a guideline range of 57-60 months.   At his sentencing, the government argued that Mr. Anikeyev had been involved in dozens of fraudulently-incorporated clinicsand that he had: paid kickbacks for patient referrals; owned and operated multiple acupuncture corporations; placed acupuncturists in nearly all of the no-fault clinics involved in this case; derived and pocketed all of the profits; led an extravagant lifestyle; was an "orchestrator" of the whole scheme who worked closely with the RICO defendants; billed for overstated treatments; and was more closely aligned

---

[7]

At this sentencing, the court observed with regard to the "sophisticated means" enhancement that some schemes are more sophisticated than others.  The court also noted that Mr. Slobodansky's actions were not isolated and that his profit, though not as great as some, certainly exceeded a mere employee who received a salary.  9/9/13 trans. pp.21-23.

to the RICO defendants than people like Dr. Gabinsky.  9/9/13 trans. pp. 5-6, 26-27.  This Court agreed that Mr. Anikeyev's role was extensive, deliberate and continued for a long period of time, and that he "profited quite a bit" far and above receiving a mere salary, but still elected to sentence him to 42 months of imprisonment, far below his guideline range.  9/9/13 trans. pp. 29-30.

Just today, this Court just sentenced Vladmir Grinberg, whose guideline range was 46-57 months, to 24 months of imprisonment.  During the proceedings (which are not yet transcribed), this Court observed, *inter alia,* that Mr. Grinberg, as a licensed social worker, should be held to a higher standard since he "knew what he was doing."  This Court also noted that Mr. Grinberg owned and operated two corporations, billed for unnecessary psychological services, paid kickbacks to no-fault clinic owners and used blank checks to avoid detection.

But the defendant most closely aligned to Mr. Ostrumsky is Boris Treysler, who stipulated to a loss amount of $3,337,195 and a guideline range of 70 to 87 months of imprisonment.  At the outset of his sentencing proceeding, this Court inquired why Mr. Treysler was required to plead to money laundering where other defendants were not; in response, the government indicated that the reason was because Mr. Treysler was "involved in negotiating the checks" and they viewed him as "extremely culpable." The prosecutor noted that he had even admitted during his plea to working with check cashiers to get money for the purposes of paying kickbacks.  10/29/13 trans. p.12.

Following further argument by the parties, this Court observed that Mr. Treysler's involvement was extensive, deliberate and continued from 2008-2012.  10/29/13 trans. p.22. This Court commented that the loss amount often resulted in an overstatement of the guideline range, but that was less of a factor where the defendant directly profited from the offense.  While the loss amount was "less certain" for Mr. Treysler than with the other defendants, that was "canceled out"

to some degree by the fact that he was more involved in the money laundering aspects of the case. 10/29/13 trans. p.24.  Recognizing that Mr. Treysler was remorseful and had led a good life in many respects, this Court imposed a sentence of 42 months, significantly lower than the guideline range. 10/29/13 trans. pp.24-25.[8]

Mr. Ostrumsky's conduct in context

Mr. Ostrumsky has admitted to the crimes of conspiracy to commit health care fraud and conspiracy to commit money laundering.  In his allocution, he basically admitted to submitting claims to insurance companies that falsely represented that doctors owned the clinic (health care fraud under the theory of "fraudulent incorporation"), as well as using some of the insurance company money to pay runners to bring patients into the clinics (money laundering).  While this conduct is undoubtedly serious, it is readily apparent that he is less culpable than his co-defendants in important respects.

First, unlike Mr. Anikeyev, Mr. Bahrukin and to a lesser extent Mr. Slobodansky, Mr. Ostrumsky did not realize large profits from his involvement in the clinics.  His earnings were very modest (no more than $50,000 altogether during the entire period of the indictment), far less than what the doctors at his clinics received, and he certainly did not lead an extravagant lifestyle. Second, unlike doctors and other providers, it cannot be said that Mr. Ostrumsky received specialized medical training, so as to justify holding him to a higher standard.  Third, unlike Mr.

---

[8]

Also relevant is Alexander Sandler, who reportedly owned three clinics, faced a guideline range of 57-60 months and was sentenced to a term of 45 months of incarceration and over $4.8 million in restitution.  Most recently, Michael Bahrukin, who stipulated to a loss amount of $2,371,563 and faced a guideline range of 57-71 months, was sentenced to 40 months of incarceration.  The government argued in its sentencing letter that Mr. Bahrukin invested in and had a partnership stake in three clinics, exercised control over the clinics, billed the insurance companies, laundered the proceeds and shared in the profits.  The government also claimed that Mr. Baruhkin had previously been involved in securities fraud and that the guidelines did not punish him separately for his gambling offense.

Slobodansky, there is no evidence that Mr. Ostrumsky attempted to evade law enforcement repeatedly through the use of multiple corporations.  Nor is there evidence that Mr. Ostrumsky knowingly participated in extensive billing for unnecessary or unperformed services, as did Mr. Greenshner, Poznansky, Grinberg and Voytenko.

Particularly noteworthy are some distinctions between Mr. Ostrumsky and Mr. Treysler.  The government's position, presumably, is that they should be treated the same because they were the co-owners of two clinics: NTT and DST.  But their situations are not comparable.  To begin with, Mr. Ostrumsky's involvement with NTT was for a much shorter period of time.  NTT was incorporated in April, 2008 and began operations the next month, using funds invested by Mr. Treysler and others.  Mr. Ostrumsky did not become involved at NTT until the summer of 2009.

To some extent, the government has recognized this difference by holding Mr. Ostrumsky responsible for a smaller restitution amount than Mr. Treysler ($2,815,622.93 compared to $3,337.195).  But this difference does not actually effect the guideline determination since the threshold for a 16 level increase is a loss amount of $1,000,000, the threshold for an 18 level increase is $2,500,000 and the threshold for a 20 level increase is $7,000,000.  Thus, Mr. Ostrumsky's guideline calculation arguably treats him unfairly by holding him equally responsible as Mr. Treysler, even though Mr. Ostrumsky's loss amount is approximately $500,000 less and very close to the amount that would justify a 16-level increase rather than an 18-level increase in the offense level.  Regardless of Mr. Treysler's situation, this Court would certainly be justified in sentencing Mr. Ostrumsky to a below-guideline sentence solely on the ground that the 18-level increase is unfair to individuals such as him, whose actual loss amount is nearly below the applicable threshold amount.

Moreover, because Mr. Ostrumsky's involvement at NTT began much later than Mr. Treysler's, it follows that his conduct there was less extensive. Unlike Mr. Treyseler, Mr. Ostrumsly did not invest his own money at NTT. Nor did he identify the location, negotiate rent, sign a lease, make decisions as to who to hire and fire, open or control NTT bank accounts or sign checks.

Another significant distinction concerns money laundering. As already noted, Mr. Ostrumsky admitted to money laundering insofar as he used some of the insurance company money to pay runners to bring patients into the clinics. Unlike Mr. Treysler (and Mr. Grinberg), he did not have any involvement with check cashing companies and was not involved in negotiating checks.[9] Accepting the logic advanced by the government at Mr. Treysler's sentencing, Mr. Ostrumsky should not even have been required to plead to money laundering. Nevertheless, while Mr. Ostrumsky's conduct did, in fact, constitute money laundering, it is undeniable that Mr. Treysler's money laundering activity was considerably more extensive.

For all these reasons, simple fairness dictates that Mr. Ostrumsky be sentenced to less time than Mr. Treysler. Indeed, we believe that he is less culpable than Mr. Slobodansky – who used multiple corporations to evade law enforcement, coordinated kickback arrangements and wrote blank checks to check cashing companies – and less culpable than Mr. Anikeyev – who "orchestrated" the scheme, operated multiple acupuncture corporations, profited handsomely and led an extravagant lifestyle. Though Mr. Ostrumsky did, admittedly, have an understanding in which he would share profits, his actual earnings were very modest and his criminal conduct was not as extensive as Mr. Treysler, Mr. Slobodansky or Mr. Anikeyev.

---

[9]

Upon information and belief, the government also believes that Mr. Treysler used the clinics' credit cards to pay for some personal expenses. Mr. Ostrumsky never engaged in such behavior.

-21-

<u>Personal history and attributes</u>

Even if this Court were to disagree with the foregoing comparison, Mr. Ostrumsky's personal history would amply justify a sentence below the stipulated guideline range.   Prior to this offense, Mr. Ostrumsky had never been arrested, let alone convicted.   He has an exemplary employment record, working steadily at a variety of jobs since immigrating to this country as a nineteen-year old. Notwithstanding his conviction, his employment prospects remain strong.   His current employer speaks glowingly of Mr. Ostrumsky.   He is considered a pleasant, cooperative worker and colleague. He is an educated man, having completed the equivalent of three years of college.   He has shown the ability to learn different skills, such as carpentry and cooking.   More importantly, he has a proven, life-long dedication to earning a living and supporting his family.

Those who know Mr. Ostrumsky best unflinchingly describe him as a thoughtful, considerate, compassionate man, who eagerly offers assistance when the need arises.   The annexed letters recount countless instances of his helping relatives, friends and members of the community, when they were facing financial hardship, the death of a loved one or recovering from a natural disaster. Mr. Ostrumsky's friends and family universally characterize him as very loyal, reliable and selfless. His family eloquently describe how he has remained a devoted father during the pendency of this case, supervising all aspects of their lives and even acting as a father-figure to nephews and nieces.   Many of his relatives and friends remark that Mr. Ostrumsky always places the interest of his children and family first. Read together, these letters offer a powerful testament to  the many ways in which Mr. Ostrumsky has touched his family, friends and community, and how much he will be missed during any period of incarceration.

Considering the extraordinary high esteem in which he is held by his family, friends and community, it is not easy to understand why Mr. Ostrumsky engaged in the crime in the first place. But some aspects of his personal background may provide the answers.  A few years before getting involved in this conspiracy, he suffered a nervous breakdown, leading to years of medication and treatment.  Having depleted his savings, he likely felt a certain amount of financial pressure to make his business succeed.   He also has clearly had a problem with alcohol, even though he has not perceived it that way.  And in all likelihood, he may have been influenced by how pervasive this type of misconduct has been in the no-fault industry in New York.  To be clear, none of these factors are offered as excuses or to minimize his conduct, but rather simply to explain his thought process.

Whatever led him to commit this crime, there is no reason to believe that Mr. Ostrumsky will commit another crime in the future.  His prior record demonstrates that this crime was an aberration, one that has caused him considerable shame.  As Rabbi Winner observes, Mr. Ostrumsky "is presently a broken person *** remorseful for the errors committed."  Further, his education, employment history and skills provide reasons to be optimistic about his prospects. And his family and friends will provide crucial support that most defendants could only envy.  Even a minimal period of incarceration, therefore, will serve as ample deterrent.

For all the foregoing reasons, we submit that a sentence within the guideline range – or even close to the guideline range– would be too severe and far "greater than necessary" to meet the statutory purposes of 18 U.S.C. § 3553(a).  While the crimes to which he pled are admittedly serious, a guideline sentence would neither be just nor promote respect for the law (factor "A").  A lengthy sentence is not necessary to afford deterrence or protect the public from further crimes (factors "B" and "C").  Nor would a lengthy period of additional incarceration provide him with "needed

-23-

educational or vocational training, medical care, or other correctional treatment" (factor D).  Finally, a relatively lenient sentence is necessary to avoid unjust disparities with similarly-situated defendants.

Finally, whatever sentence is imposed, we ask this Court to recommend that Mr. Ostrumsky be designated to a prison as close as possible to New York City (preferably FCC Allenwood), so that his family may be able to visit him with as little hardship as possible, and that he be placed in a program to address his apparent problem with alcohol.[10]

Dated:  New York, NY
        December 2, 2013

                                        _____/s/_____
                                        James E. Neuman, Esq.
                                        Attorney for Defendant Mikhail Ostrumsky
                                        100 Lafayette Street
                                        Suite 501
                                        New York, NY 10013
                                        (212) 966-5612

cc:    Daniel Goldman, AUSA (by email)

---

[10]      We also ask that this Court direct that restitution payments begin after Mr. Ostrumsky is released from incarceration.  This Court reportedly has issued similar directives for other defendants, including Mr. Grinberg.